## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

---

THERESA JOSEPH and
LEAH JOSEPH,

                Plaintiffs,

vs.

WALTER WILMERDING,
in his fiduciary capacity and
in his individual capacity,

                Defendant.

CV 11-109-M-DWM-JCL

FINDINGS & RECOMMENDATION
OF UNITED STATES
MAGISTRATE JUDGE

---

This matter comes before the Court on Defendant Walter Wilmerding's

motion for partial summary judgment. For the reasons set forth below, the motion

should be granted as to Counts II through V, but denied with regard to Count VI

and Plaintiffs' request for punitive damages.

## I.    Background[1]

Plaintiff Theresa Joseph ("Joseph") and her ex-husband, Murray

Wilmerding ("Murray"), have three children – Lucia, Kelsey, and Silas – who are

all young adults in their twenties.  Joseph and Murray divorced in the mid-1990s,

and Plaintiff Leah Joseph ("Leah") is Joseph's daughter from a subsequent

---

[1] Consistent with well-established summary judgment standards, the following
facts are taken from the materials of record and, where disputed, viewed in the
light most favorable to the Plaintiffs as the non-moving party.

relationship. Several years ago, Murray's parents, Lucius and Adela Wilmerding, established separate trusts for their three grandchildren. Lucius named his brother, Defendant Walter Wilmerding ("Wilmerding"), as trustee of the three trusts.

In the fall of 2000, Joseph rented a house at 1226 Lincoln Park Way in Missoula with an option to buy the property. At some point thereafter, Joseph and Murray discussed the possibility of using money from the trusts created on behalf of their three children to purchase the house. Plans to that effect apparently developed, and Lucius advised Wilmerding that he wanted to use trust assets to purchase the house for Joseph and his three grandchildren. Lucius deposited additional funds in each of the trusts to fund the acquisition, and retained an attorney in Missoula to handle the transaction. The property was purchased with trust fund assets in November 2001, and Wilmerding has since held title to the property in his own name as trustee.

Once the home was purchased, Joseph live there with her four children, all of whom were minors at the time. Joseph stayed at the house rent free, but paid the utility bills, and made some repairs and improvements to the property. Dkt. 25-5, at 2. According to Joseph, Lucia, Kelsey, and Silas all promised her that she could live on the property with Leah until Leah finished high school. Dkt. 24-7, at 23.

In June 2002, a storm damaged a number of trees on the property, which prompted Joseph to contact Wilmerding's office and ask about homeowners insurance. Dkt. 24-7, at 11. After speaking with Wilmerding's assistant, Carol Sawyer, Joseph learned there was no homeowners insurance policy in place and she ended up using her own funds to have the trees removed. Dkt. 24-7, at 11 & 13.

On June 29, 2009, a fire broke out in the garage and damaged the home. By the time of the fire, Lucia and Kelsey were of majority age and had moved out of the house. Joseph was living in the home with 13-year-old Leah and 20-year-old Silas when the fire ocurred. Silas moved out not long after the fire and Lucia returned to the property, moving into a basement apartment in the home with her husband and child.

Notwithstanding the damage done by the fire, Joseph and Leah continued to live in the main part of the house. Joseph claims they spent the next several months living in the house with no roof over the living room, an unusable kitchen, and a blanket hanging between the burned out living room and the bedrooms. It was not until May 2010 that the trust beneficiaries' grandmother, Adela Wilmerding, provided funds to partly repair the house.

In June 2011, Joseph and her daughter Leah filed suit against Wilmerding in state court to recover the damages they claim to have suffered as the result of the

fire and the fact that there was no homeowners policy in place to cover their alleged losses.  Dkt. 5.  Joseph maintains that Wilmerding breached his duties as trustee by not purchasing homeowners insurance and refusing to pay for repairs to the house after the fire.  Joseph alleges she sustained at least $58,000 in personal property damages as a result of the fire, and lost at least $80,000 in business earnings because the fire destroyed the dressmaking and bookkeeping businesses she operated out of the house.  Dkt. 5, ¶¶ 23, 25-29.  Joseph also claims to have "incurred thousands of dollars of additional expenses related to making the house minimally livable after the fire, higher heating costs, and higher food costs because the kitchen was unusable."  Dkt. 5, ¶ 24.

Johnson's complaint sets forth the following claims against Wilmerding, both individually and in his fiduciary capacity as trustee: (Count I) negligence; (Count II) breach of contract; (Count III) breach of the implied covenant of good faith and fair dealing; (Count IV) negligent infliction of emotional distress; (Count V) intentional infliction of emotional distress; (Count VI) malicious acts or omissions.  The complaint also includes a request for punitive damages.

Wilmerding removed the case to this Court based on diversity jurisdiction in August 2011, and has since moved for summary judgment on all of Joseph's claims, with the exception of Count I.

## II.    Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(a), a party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories or admissions on file "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials" of the pleadings. *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson*, 477 U.S. at 249-50. The Court must

5

view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.    Discussion

### A.    Breach of Contract

Joseph alleges that she and Wilmerding formed an implied contract "that involved her serving as onsite caretaker of the property for which he was trustee." Dkt. 5, ¶ 53. As Joseph explains it, she was to act as caretaker by watching over the property, and paying for repairs, improvements, and utilities. According to Joseph, it was also understood that she was to act as the primary caregiver for her three children, who were the trust beneficiaries for whom the property had been purchased. Dkt. 5, ¶ 56. Joseph claims that in exchange for providing these services, she was allowed to live on the property without paying rent. Dkt. 5, ¶ 56.

A contract may be either express or implied. While the terms of an express contract are stated in words, the existence and terms of an implied contract "are manifested by conduct."[2] Mont. Code Ann. § 28-2-103. An implied contract must contain: "(1) identifiable parties capable of contracting; (2) their consent; (3)

---

[2] Sitting in diversity jurisdiction, this Court looks to the substantive law of Montana as the forum state for purposes of the ensuing analysis. *See Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

a lawful object; and (4) a sufficient cause or consideration."  Mont. Code Ann. §
28-2-102.

Wilmerding concedes that he and Joseph were parties capable of
contracting, and that a contract to be the caretaker of a home is a lawful object.
Focusing on the second and fourth elements, however, Wilmerding argues that
Joseph's implied contract claim fails as a matter of law because there was no
mutual consent and no consideration.

1.    Consent

As a general principle, "[t]he consent of the parties to a contract must be: (1)
free; (2) mutual; and (3) communicated by each to the other."  Mont. Code Ann. §
28-2-301.  "Mutual consent consists of an offer and an acceptance of that offer.
*Bitterroot Intern. Systems, Ltd. v. Western Star Trucks, Inc.*, 153 P.3d 627, 635
(Mon. 2007).   Where, as here, the alleged contract is an implied one, consent may
be established by the conduct of the parties.  *CB&F Development Corp. v.
Culbertson State Bank*, 844 P.2d 85, 87-88 (Mont. 1992).  See also *Bitterroot
Intern. Systems*, 153 P.3d at 635 (stating that mutual consent may exist "based on
the consent that the parties express through their words and the consent that the
parties imply through their conduct.").

According to Wilmerding, he and Joseph never reached any agreement as to
the terms of the alleged contract.   In fact, Wilmerding maintains that he and

Joseph never even discussed the purchase of the home, and never spoke about the details of her residence there. Wilmerding states in his supporting affidavit that he "never spoke with nor communicated in any other fashion with Theresa Joseph in 2001 about the acquisition of the property at 1226 Lincoln Park Way in Missoula, Montana" and has "no record that Ms. Joseph ever attempted to contact [him] about the matter." Dkt. 17-4, ¶ 9. Wilmerding makes clear that he has "never spoken nor communicated with Theresa Joseph in any fashion about the subject of her serving as a caretaker of the property," or of the need to make repairs or improvements to the property. Dkt. 17-4, ¶¶ 12-14.

Joseph's deposition testimony is consistent with Wilmerding's version of events. Joseph testified that she had never had "a discussion specifically determining us having a contract," and agreed that she had never had any discussions with Wilmerding about the basis on which she could live at the house. Dkt. 24-7, at 22-23. When asked more specifically whether she had spoken with Wilmerding about acting as a caretaker of the property, Joseph simply stated that she did not recall. Dkt. 24-7, at 22. Joseph indicated she had no reason to believe that Wilmerding would have known she was running two businesses out of the home because, in her words, "[w]e didn't communicate." Dkt. 24-7, at 34. As Joseph explained it, she did not "know that the contract was formalized at any specific date." Dkt. 24-7, at 22. Rather, she viewed it as "an understood contract"

that she could live at the house rent free "provided [she] performed the duties of caretaker and parent to those children, and the person who was on the ground taking care of that investment." Dkt. 24-7, at 22. While that may have been Joseph's understanding, Wilmerding argues there is no evidence that the two of them mutually consented to those terms, and no evidence of the offer and acceptance required for purposes of establishing a contract.

Joseph does not claim to have reached a verbal or written agreement with Wilmerding, but maintains they manifested their mutual consent through their conduct. Joseph argues that Wilmerding offered her a free place to live by purchasing the property and paying the property taxes. Joseph claims she accepted Wilmerding's offer by living on the property, paying utilities, making repairs on the property, and acting as guardian of the beneficiaries for whom the property was intended. Dkt. 24, at 5-6.

The record indeed reflects that Joseph has lived on the property rent free since Wilmerding purchased it on behalf of the trust in 2001. The record also reflects that Joseph made some repairs and minor improvements to the property during this time. For example, Joseph's ex-husband Murray states that he knew Joseph had "acted as caretaker for the property" between 2001 and 2009, and "took care of the yard, painted, etc." Dkt. 24-5. Joseph similarly testified that she did number of things to make the house livable after the trust bought it, like

"[c]leaning it, painting it, putting in carpeting, [and] making repairs that were of an immediate nature." Dkt. 24-7, at 10; Dkt. 24-7, at 25. And when a storm damaged several trees on the property in June 2002, Joseph paid to have them removed once it became apparent that there was no homeowners insurance policy in place. Dkt. 24-7, at 11. The record thus contains some evidence to support Joseph's claim that she has performed various caretaking tasks at the property.

Noticeably missing, however, is any evidence that Wilmerding knew Joseph was performing those tasks, much less that he intended for her to do so as a condition of her living there rent-free. As noted above, it is undisputed that Joseph and Wilmerding never spoke about the alleged caretaker agreement. Dkt. 24-7, at 22 & 23. In fact, Joseph testified at her deposition that "[t]he improvements and repairs that [she] made to the property were [her] elective," and that she "chose which things were going to be repaired and improved for the immediate satisfaction of [her] children's living conditions." Dkt. 24-7, at 23. While Joseph may have taken on the role of caretaker by making repairs to the property as time went by, she does not point to any evidence that Wilmerding knew of her conduct or consented to her assuming that role. The only evidence Joseph cites to is Murray's affidavit, which simply indicates that he himself knew Joseph was acting as a caretaker for the property. Dkt. 24-5. But there is nothing in Murray's affidavit suggesting that Wilmerding was similarly aware of Joseph's

10

role or had consented to an arrangement by which Joseph could live in the house rent-free in exchange for making repairs or improvements to the property.

To the extent Joseph claims she and Wilmerding had an implied contract that she could live in the house rent-free in exchange for paying the utility bills, the record is somewhat different. As plans were being made to purchase the property, Wilmerding received a handwritten note from his brother Lucius setting forth some of the details, including the fact that Joseph was to pay for utilities. Dkt. 17-4, at 7. Joseph testified at her deposition that she paid for all utilities on the property between 2001 and the fire in June 2009. Dkt. 24-7, at 25. Joseph explained that after the fire, she began sharing the cost of utilities with Lucia, who had moved into a basement apartment on the property. Dkt. 24-7, at 18-19. The record thus reflects that Joseph did in fact pay for utilities as anticipated by the parties when the trust purchased the house, and Wilmerding does not argue otherwise. Drawing all inferences in favor of Joseph, it is possible that a rational trier of fact could find that she and Wilmerding engaged in conduct manifesting their consent to an arrangement by which Joseph could live rent-free on the property in exchange for paying utilities.

## 2. Consideration

Even assuming that to be the case, Wilmerding argues that Joseph's implied contract claim nonetheless fails for lack of consideration. "Good consideration

11

consists of '[a]ny benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer." *Larson v. Green Tree Financial Corp.*, 983 P.2d 357, 360 (Mont. 1999) (quoting Mont. Code Ann. § 28-2-801).

Joseph maintains the alleged implied contract was supported by sufficient consideration because Wilmerding, as trustee, was legally responsible for maintaining the property as an asset of the trust and therefore benefitted from having her pay utilities. Joseph claims to have suffered prejudice because she paid for those utilities, which would have otherwise been the responsibility of the trust.

Wilmerding characterizes things differently, and takes the position that Joseph paid for the utilities primarily for her own personal benefit so that she could live comfortably at the home with her children, and that any benefit to him as trustee was, at best, tangential. As Wilmerding acknowledges, however, one or more of the trust beneficiaries have lived in the house at various times over the years and used the utilities. Wilmerding also acknowledges that paying for utilities at the house was "partly necessary for maintenance of the trust asset." Dkt. 31, at 3. As a trustee responsible for maintaining the trust assets, Wilmerding would have benefitted from having Joseph pay those utilities. And Joseph would have suffered some prejudice by paying for utilities that would

otherwise have been paid by the trust, which means that a trier of fact could well find adequate consideration to support the alleged contract.

       3.    <u>Breach</u>

Even assuming Joseph's implied contract claim does not necessarily fail as a matter of law for lack of consent or sufficient consideration, Wilmerding argues he is nonetheless entitled to summary judgment because there is no evidence that he breached the alleged agreement. Dkt. 31, at 5. The Court agrees.

Joseph's complaint describes the alleged implied contract as follows:

> Mr. Wilmerding formed a contract with Ms. Joseph under which she acted as caretaker of the property, paying for repairs, improvements, utilities, and watching over the property. Most importantly, Ms. Joseph acted as primary caregiver for the Wilmerding children for whom the property had been purchased. In exchange for these services, she was permitted to live on the property without paying rent.

Dkt. 5, ¶ 56.

Joseph asserts that Wilmerding breached this alleged contract in two ways: (1) by failing to purchase homeowners insurance, and; (2) by willfully refusing to repair the property after the fire. Dkt. 5, ¶¶ 60-61.

       a.    *Homeowners Insurance*

As set forth in her complaint, Joseph's theory is that "Wilmerding had a duty under this contract to act as a reasonable person and purchase homeowners insurance for the property on which [she] was living." Dkt. 5, ¶ 59. In response to

the summary judgment motion, Joseph argues more specifically that "[w]ithin this contractual relationship between trustee and caretaker, there was an implicit understanding that Mr. Wilmerding had arranged for homeowners insurance." Dkt. 24, at 6.

But Joseph does not point to any evidence whatsoever that she and Wilmerding had come to such an understanding, either verbally or through their conduct, when they allegedly entered the implied contract. As discussed above, Wilmerding makes clear that he never spoke or communicated with Joseph about the trust's acquisition of the property or about having her act as a caretaker, and Joseph has not pointed to any evidence to the contrary. While Joseph may well have assumed that Wilmerding would purchase homeowners insurance, there is no evidence that he was of the same understanding, or that the two of them reached any agreement to that effect. If anything, the evidence suggests Wilmerding would have been of the understanding that Joseph was to procure homeowners insurance because Lucius's note to Wilmerding detailing plans for the purchase stated that she would "pay annual [h]ome insurance." Dkt. 17-4, at 7.

Even assuming she and Wilmerding did not reach an implicit understanding regarding homeowners insurance at the outset, Joseph argues they arrived at an "express understanding" in June 2002, when a storm knocked down several trees on the property. Joseph claims that she spoke with Wilmerding and his assistant

several times on the telephone after the storm and learned that there was no homeowners insurance policy in place. Dkt. 27, ¶ 3. Joseph maintains that Wilmerding specifically told her during one of those conversations that he would arrange for the house to be insured and told her that she should not "worry [her] pretty little head about it." Dkt. 27, ¶ 4. According to Joseph, she then took it upon herself to pay the immediate costs of removing the trees "and trusted, based on that conversation, that the house would be insured in the future." Dkt. 27, ¶ 4.

Joseph contends that "this conversation constituted an oral agreement to a material term of the caretaker contract – [Wilmerding's] purchasing of homeowner's insurance – which was communicated between the parties." Dkt. 24, at 7. But Joseph has alleged that her implied contract with Wilmerding arose several months earlier. Joseph does not explain how a conversation that allegedly took place after they established their contractual relationship could be considered a material term of the contract. As discussed above, Joseph has not come forward with any evidence to support her allegation that when Wilmerding bought the property they had an "implicit understanding" that he had procured homeowners insurance or would be responsible for doing so in the future.

To the extent Joseph maintains that Wilmerding's alleged promise to buy insurance modified the original alleged implied caretaker contract, or constitutes a separate contract, she is mistaken. As with stand-alone contract, a modification to

15

a contract must be supported by new and independent consideration.  See e.g.

*Gates v. Life of Montana Ins. Co.*, 638 P.2d 1063, 1066 (Mont. 1982).   Even

assuming Wilmerding did promise to arrange for homeowners insurance, Joseph

did not offer anything additional in exchange for that assurance.  Because

Wilmerding's alleged promise was not supported by consideration, it could not

have modified the terms of the alleged implied contract.

As Joseph has characterized it, the implied contract had nothing to do with

homeowners insurance.  It was, if anything, an implied agreement whereby

Wilmerding would allow Joseph, as the guardian of the trusts' minor beneficiaries,

to live on the property rent-free in exchange for paying utilities.  Dkt. 24, at 5-6.

Because the contract as alleged by Joseph did not require Wilmerding to procure

homeowners insurance, his failure to do so was not a breach.

b.    *Repairing the Property*

Joseph also accuses Wilmerding of breaching his duties under the implied

contract because "he willfully refused to repair the property after the fire, causing

[her] to incur additional damages in lost business and causing further emotional

distress to her and to her daughter Leah."  Dkt. 5, ¶ 61.   But because the

undisputed evidence shows that Wilmerding fulfilled any obligations he may have

had under the implied contract that Joseph alleges had arisen between them,

Joseph's claim fails as a matter of law.

16

As Joseph describes it, the alleged contract was one by which Wilmerding agreed to let her, as the guardian of the trusts' minor beneficiaries, live in the house rent-free in exchange for paying utilities.[3]  Dkt. 24, at 5-6.  By all accounts, Wilmerding has done just that.  Joseph has lived in the house without paying rent since November 2001.  Although the home was damaged by the fire, Joseph did not move out, and is apparently still living there with her daughter Leah.  Joseph maintains the only reason she did not move out after the fire is because she could not afford to do so.  That may well be, but Joseph's reason for not moving has nothing to do with the question of whether Wilmerding lived up to his obligations under the alleged contract.  If anything, Wilmerding's contractual duty was to let Joseph live rent-free on the property.  It is undisputed that Wilmerding has allowed Joseph to stay in the house without paying rent, and that she remains there to this day.

It is also worth noting that the basement apartment on the property was not damaged by the fire, and has at all times been habitable.  But because her daughter Lucia decided to move into that apartment with her family, Joseph remained in the main part of the house, which she claims was barely habitable for several months after the fire.  Once again, however, Joseph's reasons for choosing to continue

---

[3] As discussed above, there is no evidence to support Joseph's claim that she and Wilmerding also agreed she was to make repairs and improvements to the property in exchange for living there rent free.

living in the house are simply not relevant to the question of whether Wilmerding

breached his contractual duty. Wilmerding has at all times allowed Joseph to

continue living in the house rent-free, which is all he was arguably obligated to do

under the alleged contract. Consequently, Joseph's claim that Wilmerding

breached their implied contract by willfully refusing to repair the house after the

fire fails as a matter of law.

### B.     Promissory Estoppel

Joseph argues in the alternative that she should be allowed to recover

against Wilmerding under the equitable theory of promissory estoppel, which

requires proof of the following: "(1) a promise clear and unambiguous in terms;

(2) reliance on the promise by the party to whom the promise is made; (3)

reasonableness and foreseeability of the reliance; and (4) the party asserting the

reliance must be injured by the reliance." *Payne Realty and Housing, Inc. v. First

Sec. Bank of Livingston*, 844 P.2d 90, 95 (Mont. 1992).

As Joseph tells it, Wilmerding promised her after the storm damaged several

trees on the property in June 2002 that he would arrange for homeowners

insurance and she should not "worry [her] pretty little head about it." Dkt. 27, ¶ 4.

Joseph maintains that this was a clear and unambiguous promise to insure, on

which she detrimentally relied "by not purchasing any insurance herself and by not

changing her living situation in response to the absence of insurance." Dkt. 24, at

14. Joseph claims she was injured by her reliance on "Wilmerding's promise, because the lack of insurance meant that she suffered all of the losses that are the subject of this lawsuit." Dkt. 24, at 14.

As Joseph concedes, however, she did not plead promissory estoppel in her complaint, and made only an implied contract claim. Joseph therefore seeks leave to amend her complaint to present a promissory estoppel theory of contract liability. Dkt. 24, at 16. Joseph asks the Court to allow the amendment under Federal Rule of Civil Procedure 15(c), which provides that "[a]n amendment to a pleading relates back to the date of the original pleading" when certain criteria are met.

But because Joseph's request comes after the December 12, 2011, deadline for amending the pleadings set forth in the Court's scheduling order, Rule 16(b) provides the controlling standard. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). Under Rule 16(b), a party must show good cause for not having amended the complaint before the deadline specified in the scheduling order. *Coleman*, 232 F.3d at 1294. "Rule 16(b)'s 'good cause' standard primarily considers the diligence of the party seeking the amendment." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992).

Good cause exists if the pretrial schedule "cannot reasonably be met despite the diligence of the party seeking the extension." *Johnson*, 975 F.2d at 609

(quoting Fed. R. Civ. P. 16 advisory committee's notes (1983 amendment)). One factor for the Court to consider in making this assessment is "whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006). While prejudice to the opposing party may provide an additional reason to deny a motion to amend, "the focus of the inquiry is upon the moving party's reasons for seeking modification." *Johnson*, 975 F.2d at 609. "If that party was not diligent, the inquiry should end." *Johnson*, 975 F.2d at 609.

Here, the Court finds Joseph has not acted diligently in seeking leave to amend. Her request comes more than five months after the deadline for amending the pleadings. All of facts giving rise to Joseph's proposed promissory estoppel claim were known to her when she first initiated this action in June 2011. There was nothing to prevent Joseph from asserting her promissory estoppel claim within the time period allowed for amendment under the scheduling order. Because Joseph has not demonstrated good cause or diligence as required by Rule 16(b), her request to amend the complaint to add a contract claim based on promissory estoppel is properly denied.

### C.     Breach of the Implied Covenant of Good Faith and Fair Dealing

Joseph's third cause of action alleges that Wilmerding breached the implied covenant of good faith and fair dealing by "willfully and with deliberate

indifference refus[ing] to purchase homeowners insurance" or repair the home after the fire. Dkt. 5, ¶¶ 64-66.

"The covenant is a 'mutual promise implied in every contract that the parties will deal with each other in good faith and not attempt to deprive the other party of the benefits of the contract through dishonesty or abuse of discretion in performance." *Knucklehead Land Co., Inc. v. Accutitle, Inc.*, 172 P.3d 116, 121 (Mont. 2007) (quoting *Phelps*, 170 P.3d at 484). "In order to recover on a theory of breach of the implied covenant of good faith and fair dealing, there must be an enforceable contract to which the covenant attends." *Phelps v. Frampton*, 170 P.3d 474, (Mont. 2007).

Wilmerding argues he is entitled to summary judgment on this claim because if there is no implied contract, there can be no breach of the implied covenant of good faith and fair dealing. As discussed above, however, there are questions of fact as to whether Joseph and Wilmerding had an enforceable implied contract. It is therefore possible that the parties had formed an implied contract to which the covenant could attach.

Even assuming they did form a contract, Wilmerding argues that Joseph's claim for breach of the implied covenant of good faith and fair dealing nonetheless fails as a matter of law because there is no evidence that he breached the terms of the underlying contract. As the Montana Supreme Court has made clear, however,

"[a] breach of the underlying contract is not a prerequisite to a breach of the implied covenant of good faith and fair dealing." *Phelps*, 170 P.3d at 484. Theoretically, then, it is possible for a party to breach the implied covenant of good faith and fair dealing without having breached the terms of the underlying contract. But this is not such a case.

As pled, Joseph's claims for breach of contract and breach of the implied covenant of good faith and fair dealing are virtually identical. Both claims are premised on the same facts and allege that Wilmerding breached his duties by failing to purchase homeowners insurance and willfully refusing to repair the home after the fire. Dkt. 5, ¶¶ 60-61, 65-66. As discussed above, however, the contract as alleged by Joseph did not require Wilmerding to procure homeowners insurance or to repair the house after the fire. Joseph has not alleged any additional facts that would support an independent claim for breach of the implied covenant of good faith and fair dealing. Because Joseph's claim for breach of the implied covenant of good faith and fair dealing is duplicative of her breach of contract claim, it too fails as a matter of law.

### D.     Negligent and Intentional Infliction of Emotional Distress

Joseph has asserted independent claims for negligent and intentional infliction of emotional distress. Dkt. 5, ¶¶ 68-73. She alleges that she and her daughter "suffered severe emotional distress because of the fire and because of

22

Walter Wimerding's refusal to pay for repairs or to reimburse [her] for her lost personal property."  Dkt. 5, ¶ 30.

The Montana Supreme Court has recognized that negligent and intentional infliction of emotional distress may, under certain circumstances, stand as independent causes of action.  *Sacco v. High Country Independent Press, Inc.*, 896 P.2d 411 (Mont. 1995).  In doing so, however, the Court established a heightened standard of proof, holding that such stand-alone claims will only "arise under circumstances where serious or severe emotional distress to the plaintiff was the reasonably foreseeable consequence of the defendant's negligent or intentional act or omission."  *Sacco*, 896 P.2d at 428-29.

Wilmerding first argues that he is entitled to summary judgment on both of Joseph's emotional distress claims because she has not pointed to any evidence that she or her daughter suffered from "serious or severe" emotional distress as contemplated by *Sacco*.  The *Sacco* Court defined "serious or severe emotional distress" as distress that is "so severe that no reasonable person could be expected to endure it."  *Lorang v. Fortis Ins. Co.*, 192 P.3d 186, 222 (Mont. 2008) (quoting *Sacco*, 896 P.2d at 425-26, 428-29)).

Wilmerding maintains that the emotional distress Joseph claims to have suffered does not rise to this level.  As Wilmerding notes, for example, it is undisputed that Joseph and her daughter were never treated by a psychologist,

psychiatrist, or medical doctor for emotional distress, and were not prescribed any medication. Joseph nonetheless argues without any citation to the record that she and her daughter "suffered for months, with no hope or end in sight, severely and substantially, to the point Leah could not function in her day-to-day affairs and Theresa thought of ending it all." Dkt. 24, at 21. But Joseph has not provided any evidence from friends, family, or medical professionals to corroborate these allegations.

Joseph simply submits in her own supporting affidavit that she and her daughter were "emotionally devastated by the house not being repaired for all those months," cried constantly, and felt abandoned. Dkt. 27, ¶¶ 9-10. Joseph explains that she considered suicide, and states that her daughter was so upset that she was not able to go to school. Dkt. 27, ¶¶ 9-10. But the sadness and depression that Joseph claims she and her daughter experienced after choosing to remain in the fire-damaged home and continue living there rent-free do not rise to the level of serious or severe emotional distress required to sustain an independent cause of action under *Sacco*.

Even if they did, Wilmerding argues in the alternative that Joseph's emotional distress claims should be summarily dismissed because she cannot show that the emotional distress she alleges "was the reasonably foreseeable

consequence" of any negligent or intentional act or omission on his part. *Sacco*, 896 P.2d at 428-29. The Court agrees.

Joseph first alleges that she and her daughter "suffered severe emotional distress because of the fire" at the house. Dkt. 5, ¶ 30. But Wilmerding did not cause the fire. It simply cannot be said that any emotional distress resulting from the fire itself was in any way due to any negligent or intentional act or omission by Wimerding.

Joesph also claims that "Wimerding's refusal to pay for repairs or to reimburse [her] for her lost personal property" caused her and her daughter severe emotional distress. Dkt. 5, ¶ 30. But it is undisputed that Joseph never communicated with Wilmerding at all after the fire and never contacted him about the need to make repairs to the house. Dkt. 24-7, at 20-22; Dkt. 17-4, ¶ 14. Particularly where there is no evidence that Wilmerding was aware of Joseph's plight, it is difficult to see how the emotional distress she claims to have suffered could have been the reasonably foreseeable consequence of his alleged failure to repair the house. *Sacco*, 896 P.2d at 428-29.

In closing, it is worth noting that *Sacco*'s heightened standard "applies only to independent causes of action for infliction of emotional distress, and not to emotional distress claimed as an element of damage arising from a different cause of action (sometimes called 'parasitic claims' for emotional distress)." *White v.*

*Longley*, 244 P.3d 753, 762-63 (Mont. 2010). Thus, there is nothing to prevent Joseph from seeking compensation for emotional distress as an element of damages in connection with her negligence claim.

### E. Malicious Acts or Omissions and Punitive Damages

Joseph has alleged a cause of action for malicious acts or omissions and requested an award of punitive damages. To prevail on her punitive damages claim, Joseph must ultimately establish by clear and convincing evidence that Wilmerding was "guilty of actual fraud or actual malice." Mont. Code Ann. § 27-1-221(1) and (5). A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and deliberately proceeds to act with indifference to, or in conscious or intentional disregard of, the high probability of injury to the plaintiff. Mont. Code Ann. § 27-1-221(2).

Joseph accuses Wilmerding of acting with deliberate indifference by not purchasing homeowners insurance, by choosing to treat the property as an "unsupervised asset" of the trust, and by refusing to repair the property after the fire. As discussed above, however, Wilmerding did not have a contractual responsibility to purchase homeowners insurance or do more than allow Joseph to live on the property rent free. Accordingly, to the extent Joseph takes the position that she is entitled to punitive damages based on what she characterizes as

Wilmerding's bad faith breach of his implied contract with her, her claim fails. Dkt. 5, ¶ 79.

Joseph also seeks to recover under Montana's punitive damages statute on the ground that Wilmerding acted with malice and in violation of his duties as trustee by not buying insurance or repairing the property, and by treating the property as an unsupervised asset. It is significant that Wilmerding has not moved for summary judgment on Joseph's negligence claim, which is premised on the theory that Wilmerding's duties as trustee extended to her even though she is not a beneficiary of the trusts. Because Wilmerding has not challenged this theory, the Court will assume for present purposes that his duties as trustee did in fact extend to Joseph.

Viewing the parties' legal relationship from that perspective, and making all reasonable factual inferences in Joseph's favor, the Court finds Wilmerding has not established, upon the present record, the absence of a genuine issue of material fact as to whether he knew of facts or disregarded facts that created a high probability of injury. Joseph points to evidence suggesting that even though Wilmerding may have known as early as June 2002, when the storm knocked down several trees on the property, that there was no insurance in place, he did not procure a homeowners insurance policy for the property. Joseph also points to evidence that Wilmerding knew there had been a fire at the house, which was an

asset of the trust, but did not fund repairs. Whether Wilmerding acted with deliberate indifference as the trustee tasked with maintaining the trust's assets, by failing to procure homeowners insurance or undertake repairs after the fire is best resolved in the context of trial.

## IV.    Conclusion

For all of the above reasons, the Court concludes that Wilmerding has met his summary judgment burden of showing that there are no material issues of fact and that he is entitled to judgment as a matter of law as to Counts II through V of the Complaint. Wilmerding's motion should be denied, however, with regard to Count VI and Plaintiffs' request for punitive damages. Accordingly,

IT IS RECOMMENDED that Defendant's Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART.

DATED this 4th day of June, 2012.

    /s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge